UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SVGRP LLC, et al.,<br><br>　　　　　　Plaintiffs,<br><br>　　　v.<br><br>SOWELL FINANCIAL SERVICES, LLC, et al.,<br><br>　　　　　　Defendants. | Case No.16-cv-07302-VKD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 44 |

　　　　This litigation arises out of a failed partnership between the parties, all of whom are or were in the business of advising clients about financial investments. Asserting diversity jurisdiction under 28 U.S.C. § 1332, plaintiffs SVGRP, LLC ("SVGRP") and Concert Wealth Management, Inc. ("Concert") sued defendants Sowell Financial Services, LLC ("Sowell Financial") and William Sowell for alleged breach of contract, fraud, slander/libel, and unfair business practices. They claim that Sowell Financial entered into a Master Services Agreement ("Master Agreement") with SVGRP to reap the benefits of a transfer of Concert's advisor representatives and assets, with no intent of following through with its own contractual obligations.

　　　　Defendants now move for summary judgment on all claims for relief. Plaintiffs oppose the motion. Upon consideration of the moving and responding papers, as well as the oral arguments presented, the Court grants defendants' motion for summary judgment in part and denies it in part.[1]

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

# I.    BACKGROUND

Unless otherwise indicated, the following facts are not disputed.

Concert was a Registered Investment Advisor ("RIA") with the Securities Exchange Commission ("SEC") and provided regulatory services, as well as back office and technical support, to multiple investment advisor representatives ("Advisors"), all of whom were registered with Concert.

Concert considered client accounts to belong to an Advisor's book of business.  Dkt. No. 44-1 ¶ 8, Ex. G at 48:7-49:2.  Concert generated revenues through fees paid by the Advisors' clients, with the fees being either an agreed-upon amount or a percentage of the value of a client's assets under management.  *Id*. ¶ 4, Ex. C at 10:1-16.  The Advisors' client funds were held by financial custodians, such as Fidelity.  As discussed at oral argument, the parties appear to agree that in a typical fee arrangement between an advisor and an RIA, the RIA collects the fees from the end client, distributes perhaps 80-90% of those fees to the advisor managing that client's assets, and keeps the remainder.

Around July 2016, the SEC issued an order instituting cease-and-desist proceedings and imposing sanctions with respect to Concert and one of its principals, Felipe Luna.  *Id*. ¶ 6, Ex. E.  Later that same month, Fidelity notified Concert of Fidelity's decision to terminate its relationship with Concert, and gave Concert 60 days to transfer its Fidelity client accounts to a new custodian.  *Id*. ¶ 12, Ex. I.  According to plaintiffs, at that time, Concert Advisors using the Fidelity platform managed client funds of approximately $700 million.  Dkt. No. 45-2 ¶ 3.  Concert decided to focus on its back office and technical support services for its Advisors and began searching for a partner that could provide the Advisors with the regulatory oversight Fidelity required.  *Id*.

In August 2016, Concert identified Sowell Financial, an RIA based in Arkansas, as a potential partner.  At that time, Sowell Financial had approximately $500 million in assets under management.  *Id*. ¶ 4.  The parties began negotiating an arrangement whereby Concert would create a new entity to provide the Advisors with back office and technical support, including the use of certain software known as "Omniscient," and Sowell Financial would provide the Advisors with regulatory services.  Additionally, Sowell Financial says that because it did not wish to

1   jeopardize its own relationship with Fidelity, defendants did not want Concert and Mr. Luna to be

2   involved in the ownership, management, or operation of the venture and considered this a material

3   condition for any agreement.  Dkt. No. 44-2 ¶ 4; *see also* Dkt. No. 44-1 ¶ 4, Ex. C at 43:18-21.

4       To that end, Concert's principals created a separate entity, SVGRP, to provide back office

5   and technical support to the Advisors.  Dkt. No. 19 ¶ 11; Dkt. No. 44-1 ¶ 4, Ex. C at 34:1-7; Dkt.

6   No. 44-2 ¶ 5.  The "Recitals" section of what became the Master Agreement indicates that the

7   contract was meant to memorialize the terms of SVGRP's provision of those services to those

8   Advisors for whom Sowell Financial would provide regulatory services.  Dkt. No. 44-2 ¶ 19, Ex.

9   T.  It was anticipated that SVGRP would be a Florida limited liability company, and that one of

10  Concert's employees, Keith Krueger, would be SVGRP's owner and manager.  Dkt. No. 45-2 ¶ 8.

11  However, shortly before the Master Agreement was signed, Mr. Krueger left his employment with

12  Concert.  *Id*.  SVGRP was instead made a California limited liability company, and another

13  Concert employee, Erik Schei, ultimately became SVGRP's sole owner and manager.  Dkt. No.

14  44-1 ¶ 8, Ex. G at 8:10-17; Dkt. No. 45-2 ¶ 8.

15      Meanwhile, the parties continued to negotiate the Master Agreement's terms and

16  exchanged several drafts.  However, due to the time constraints imposed by Fidelity's 60-day

17  period to complete the transfer of regulatory services, Advisors began to transition from Concert

18  to Sowell Financial in September 2016 before the Master Agreement was executed.[2]  Dkt. No. 44-

19  2 ¶ 9.  Of the 60 Advisors who ultimately transitioned to Sowell Financial, 31 signed agreements

20  with Sowell Financial before the Master Agreement was completed.  *Id*.  However, plaintiffs note

21  that Concert did not transfer any assets under management to Sowell Financial until after the

22  Master Agreement was signed.  Dkt. No. 45-2 ¶ 7.

23      The Master Agreement was executed on September 26, 2016 by SVGRP and Sowell

24  Financial.  Dkt. No. 44-2 ¶ 19, Ex. T.  Section 3 of the contract addresses the compensation

25  Sowell Financial would pay to SVGRP:

26

27

28  [2] Plaintiffs seem to contend that defendants actually were in a rush to obtain Concert's Advisors
    and assets under management.  Dkt. No. 44-1 ¶ 3, Ex. B at 8:18-9:3.

                                               3

    3. <u>Compensation</u>. *In exchange for the Services provided hereunder, [Sowell Financial] shall pay to [SVGRP] a percentage of fees, commissions, or payments that it receives from [Advisors] pursuant to the [Sowell Financial/Advisor] agreements entered into [sic] the [Advisors] formerly registered with [Concert] as set forth in each Statement of Work attached hereto as Exhibit A.* Furthermore, [SVGRP] shall reimburse [Sowell Financial], in connection with each [Advisor] previously registered with [Concert], for expenses incurred which are directly attributable to affiliation and registration with [Sowell Financial] including, but not limited to, fees related to relicensing with state regulatory authorities and fees related to errors and omissions insurance.

*Id*. (emphasis added). Although this provision references Statements of Work that apparently were meant to be appended as an exhibit to the Master Agreement, it is undisputed that no Statements of Work were ever appended to the signed contract.

    The Master Agreement also contains an integration clause that provides:

    11. <u>General Terms and Conditions</u>.

        a. <u>Entire Agreement; Amendment</u>. This Agreement is intended by the Parties to be the full and final expression of their agreement and shall not be contradicted by evidence of any prior written agreement or any oral agreements or representations. The captions in the Agreement are for reference purposes only. This Agreement may not be amended, modified, altered, or changed in any respect whatsoever except by a further written agreement signed by both Parties. All exhibits and documents referenced by this Agreement are made a part of this Agreement.

*Id*. Additionally, Section 4 of the Master Agreement states that the contract would continue for a term of five years and, as relevant here, could be terminated without cause "by either Party at any time with ninety (90) days advance written notice by one Party to the other Party." *Id*.

    Plaintiffs note that within days of signing the Master Agreement, defendants announced, both publicly and within the company, that Sowell Financial had entered an agreement with SVGRP. Dkt. No. 45-1 ¶ 2, Ex. A at 78:7-13, 80:10-21 & ECF p. 29-34. In one particular announcement directed "To Our Valued Advisor Partners!," Mr. Sowell wrote, in relevant part:

    I'd like to share some exciting news! We are onboarding advisors from a 'beleaguered' competitor, which has provided a tremendous opportunity for Sowell Management Services. At the end of the day, we anticipate tripling our [assets under management] to over $1.5 Billion with over 10,000 accounts.

    While this is a very exciting opportunity for us, what does it mean

4

> for you?  This opportunity has allowed us to contract with the prior firm's operations department, which more than doubles our operations department, and will provide continuity to those advisors as they will continue to work with that operations team.  In addition, they had a capital markets division that we will onboard as well, increasing our portfolio management lineup, capabilities and Thought Leadership.
>
> The additional benefits you will receive are many; this gives us much better negotiating power with our custodians for transactional-based pricing as well as asset-based pricing.  We have already been elevated with Fidelity and TD Ameritrade to higher-level service teams and relationship managers. . . .

Dkt. No. 45-1 ¶ 2, Ex. A at 87:2-14 & ECF p. 35-36.

Following the execution of the Master Agreement, Advisors continued to transition to Sowell Financial, and by mid-November 2016, approximately $700 million in client assets were transferred from Concert to Sowell Financial.  Dkt. No. 44-2 ¶ 21; Dkt. No. 45-2 ¶ 9.  SVGRP claims that for the months of September, October and November, it provided the back office and technical support services required by the Master Agreement.  And in November 2016, SVGRP sent an invoice to Sowell Financial for services rendered.  Dkt. No. 45-2 ¶ 10, Ex. C.  That is the sole invoice SVGRP issued in connection with this matter.

Defendants claim that by this time, the parties' relationship had already begun to sour because Mr. Sowell perceived that Mr. Luna and Elizabeth Luna[3] were intervening in SVGRP's operation and management.  Dkt. No. 44-2 ¶ 21.  Noting Sowell Financial's work, expense, and risk in connection with the transition, Mr. Sowell emailed Mr. Luna to advise that Sowell Financial would only pay half of SVGRP's bill.  Dkt. No. 45-2 ¶ 11, Ex. D.  When Mr. Luna objected, Sowell Financial paid the entire invoiced amount.  *Id*. ¶¶ 12-13.

Shortly after, on November 29, 2016, Mr. Sowell sent a letter to SVGRP's Mr. Schei, advising that Sowell Financial was terminating the Master Agreement pursuant to section 4 of the contract, and that effective immediately, Sowell Financial would no longer accept services from SVGRP.  Dkt. No. 44-2 ¶ 24, Ex. W.  The letter further noted, "Additionally, considering there were no agreed upon terms in place for compensation, the money sent to SVGRP, LLC for the

---

[3] The record suggests that Ms. Luna was a Concert advisor.  *See* Dkt. No. 44-1 ¶ 7, Ex. F at 71:16-72:4.

November Billing was in error.  Please return these funds immediately to:  [Sowell Financial].”  *Id*.  SVGRP never refunded Sowell Financial's payment.

Plaintiffs contend that having abruptly terminated the Master Agreement shortly after obtaining Concert's Advisors and assets under management, defendants reaped all the benefits of that contract without fulfilling their end of the bargain.  Plaintiffs further contend that defendants had no intention of performing obligations recited in the Master Agreement and that if plaintiffs had known that, plaintiffs would have transferred the Advisors and assets under management to the Institute for Wealth Management, a different RIA to which Concert transferred other advisors and related assets pursuant to an agreement similar to the Master Agreement.  Dkt. No. 45-2 ¶¶ 14-17.  Additionally, plaintiffs claim that defendants then began disparaging Concert, as well as the Lunas, with the aim of harming their reputations and persuading more advisors to join Sowell Financial.

In plaintiffs' view, although no Statements of Work were ever appended to the Master Agreement, the parties intended, and defendants fully understood, that Sowell Financial was to pay to SVGRP 100% of the fees Concert previously retained from its advisors for the provision of both regulatory services and office/technical support, less certain expenses.  Dkt. No. 19 ¶¶ 15, 19, 21, 25.  In other words, Sowell Financial would provide the Advisors with regulatory services and give them the same percentage of fees Concert previously had; and, as for the remainder of the fees, there was to be no fee splitting as between Sowell Financial and SVGRP, even though each was now to provide services previously provided by Concert alone.  Instead, plaintiffs claim that Sowell Financial benefited from the acquisition of assets under management from Concert (without having to pay for that book of business), resulting in a considerably expanded asset pool and an upgrade in its relationships with businesses like Fidelity.

In this lawsuit, SVGRP claims that Sowell Financial breached the Master Agreement by improperly terminating the contract, without giving the required 90 days notice, and by refusing to compensate SVGRP as required by the contract.  Additionally, both Concert and SVGRP assert claims for fraud, slander/libel, and unfair business practices against Sowell Financial and Mr. Sowell.

Defendants now move for summary judgment on all claims for relief. With respect to SVGRP's contract claim, Sowell Financial contends that SVGRP cannot establish the existence of a valid and enforceable contract because the agreement is missing a material term regarding the compensation to be paid to SVGRP. Defendants further contend that there never was a meeting of the minds on that matter. As for plaintiffs' fraud claim, defendants argue that plaintiffs do not have sufficient evidence that defendants did not intend to perform obligations recited in the Master Agreement, and that the relief plaintiffs seek is barred by the economic loss rule. Additionally, defendants argue that plaintiffs do not have any evidence to substantiate their claim for slander/libel and that plaintiffs are seeking a remedy that is not available under California's Unfair Competition Law ("UCL"). For the reasons discussed below, the Court grants defendants' motion for summary judgment with respect to SVGRP's contract claim, plaintiffs' slander/libel claim and plaintiffs' UCL claim. However, the court grants in part and denies in part defendants' motion as to plaintiffs' fraud claim.

## II.     LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *See Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue

of material fact for trial. *See id.* A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 325). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. *Id.*

## III. DISCUSSION

### A. Breach of Contract[4]

Sowell Financial contends that SVGRP cannot establish the existence of a valid and enforceable contract because the Master Agreement's terms are not sufficiently definite to give rise to a contractual obligation with respect to SVGRP's compensation. Sowell Financial maintains that there was no meeting of the minds as to what it was to pay SVGRP. SVGRP, on the other hand, insists that the parties understood and intended that Sowell Financial would pay SVGRP 100% of the fees Concert previously retained from its advisors for the provision of both regulatory services and back office/technical support, less certain expenses. And, pointing to extrinsic evidence, SVGRP contends that this is, in fact, what Sowell Financial agreed to do.

#### 1. Contract Interpretation

To establish the existence of a contract, SVGRP must demonstrate mutual assent, sufficiently definite contractual terms, and consideration. *Rockridge Trust v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1142 (N.D. Cal. 2013). "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." Cal. Civ. Code § 1580.

---

[4] Although the Master Agreement says it is governed by Arkansas law, the parties briefed their arguments with respect to this claim entirely under California law without discussing the choice of law issue. The parties did not satisfactorily explain why they chose to proceed in this manner, and no one was prepared to address whether Arkansas law might be different. This order addresses the parties' arguments, as briefed and argued, under California law. In any event, as discussed below, even under California's generous parol evidence standards, plaintiffs have not demonstrated that a valid and enforceable contract was formed.

"The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe." *Weddington Productions, Inc. v. Flick*, 60 Cal. App.4th 793, 811 (1998) (citation omitted). "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." *Id*. (citing Cal. Civ. Code §§ 1550, 1565, 1580).

"In order for acceptance of a proposal to result in the formation of a contract, the proposal 'must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain.'" *Id*. (internal quotations and citation omitted). "If, by contrast, a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract." *Id*. (citation omitted); *see also Ladas v. California State Auto. Ass'n*, 19 Cal. App.4th 761, 770 (1993) ("Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable.") (quoting *Cal. Lettuce Growers, Inc. v. Union Sugar Co.*, 45 Cal.2d 474, 481 (1955)). When a material term "is reserved for the future agreement of both parties, as a general rule the promise can give rise to no legal obligation until such future agreement." *Weddington Productions, Inc.*, 60 Cal. App.4th at 812 (citation omitted). "Since either party in such a case may, by the very terms of the promise, refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise." *Id*. (citation omitted).

"Whether a contract term is sufficiently definite to be enforceable is a question of law for the court." *Ladas*, 19 Cal. App.4th at 770 n.2. The legal effect and meaning of a contract ordinarily is a question of law; and even when extrinsic evidence has been received, the legal effect and meaning of whichever version of the facts the trial court adopts is also a question of law. *Citizens Utilities Co. v. Wheeler*, 156 Cal. App.2d 423, 432 (1957). "[T]he outward manifestation or expression of assent is controlling, and what the language of a contract means is a matter of interpretation for the courts and not controlled in any sense by what either of the parties

intended or thought its meaning to be." *Id.* (citations omitted).

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. For written contracts, the parties' intention is to be ascertained from the writing alone, if possible. *Id*. § 1639. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." *Id.* § 1638.

Accordingly, the Court's analysis begins with an examination of the Master Agreement's terms. In doing so, the Court looks first to the language of the supposed contract and is bound to give its terms their ordinary meaning. *Lloyd's Underwriters v. Craig & Rush, Inc.*, 26 Cal. App.4th 1194, 1197 (1994).

As discussed, Section 3 is the sole provision of the Master Agreement addressing the compensation Sowell Financial would pay to SVGRP:

> 3. <u>Compensation</u>. *In exchange for the Services provided hereunder, [Sowell Financial] shall pay to [SVGRP] a percentage of fees, commissions, or payments that it receives from [Advisors] pursuant to the [Sowell Financial/Advisor] agreements entered into [sic] the [Advisors] formerly registered with [Concert] as set forth in each Statement of Work attached hereto as Exhibit A.* Furthermore, [SVGRP] shall reimburse [Sowell Financial], in connection with each [Advisor] previously registered with [Concert], for expenses incurred which are directly attributable to affiliation and registration with [Sowell Financial] including, but not limited to, fees related to relicensing with state regulatory authorities and fees related to errors and omissions insurance.

Dkt. No. 44-2 ¶ 19, Ex. T (emphasis added). SVGRP's central contention is that the highlighted text means that Sowell Financial was to pay 100% of the portion of the fees that did not go to the Advisor.[5] The Master Agreement might reasonably be susceptible to that interpretation if it said that Sowell Financial would pay "*the* percentage of fees" received from Advisors. It does not. Instead, it says that Sowell Financial would pay "*a* percentage" of those fees. Thus, the plain language of the Master Agreement, interpreted in its ordinary sense, indicates that Sowell

---

[5] Although the compensation provision suggests that the Advisors received the fees and paid a certain portion to the RIA, as discussed above and as SVGRP acknowledged at oral argument, distribution of the fees actually occurred the other way around, with the RIA receiving the fees and distributing a portion to the Advisors.

Financial was to pay SVGRP *some portion* of the fees that did not go to the Advisors.

But even putting that issue aside, to determine the sums Sowell Financial would pay, the Master Agreement refers to amounts that were to be set forth in "each Statement of Work attached hereto as Exhibit A." As discussed, no Statements of Work were ever appended to the Master Agreement. SVGRP does not explain why that is so, and there is no other provision in the Master Agreement that defines SVGRP's compensation. Thus, the Master Agreement provides no basis for determining what compensation terms the parties agreed to, if at all. Accordingly, the Master Agreement is not sufficiently definite to be enforceable. *See* Cal. Civ. Code § 1612 ("Where a contract provides an exclusive method by which its consideration is to be ascertained, which method is on its face impossible of execution, the entire contract is void.").

## 2. Parol Evidence

SVGRP maintains that extrinsic evidence not only shows that there was a meeting of the minds regarding SVGRP's compensation, but also fully supports SVGRP's interpretation of the Master Agreement's compensation provision. "Normally a contract's written terms alone control its interpretation: when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing." *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 962 (E.D. Cal. 2016) (internal quotes and citation omitted). "This rule, commonly called the parol evidence rule, is a rule of substantive law, not of procedure." *Id*. "Because a contract's written terms supersede statements made during the negotiations, evidence other than those written terms is irrelevant, and cannot be relied upon." *Id*. (internal quotes and citation omitted).

The parol evidence rule applies only to integrated agreements, which are those that the parties intended as a final expression of their agreement. *Id*. Whether a written contract is an integrated agreement is a question of law. *Id*. In determining whether a contract is an integrated agreement, courts consider several factors, including as relevant here, whether the contract contains an integration clause. *Id*. at 962-63.

Even assuming SVGRP had established that a valid and enforceable contract was formed, the Master Agreement is an integrated writing, as it clearly contains an integration clause stating

that the document was "intended by the Parties to be the full and final expression of their agreement and shall not be contradicted by evidence of any prior written agreement or any oral agreements or representations." Dkt. No. 44-2 ¶ 19, Ex. T.

Notwithstanding the presence of that integration clause, SVGRP insists that parol evidence of the parties' course of dealing (i.e., the parties' pre-contract negotiations) and course of performance (i.e., the parties' conduct after execution of the Master Agreement, but before any controversy arose) is admissible to show that there was complete agreement that SVGRP would be paid 100% of the portion of the fees that were not distributed to the Advisors. "Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose." *Pacific Gas & Elec. Co. v. G..W. Thomas Drayage & Rigging Co., Inc.*, 69 Cal.2d 33, 39 (1968). "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Id.* at 37. Thus, in California, courts provisionally receive and consider parol evidence to determine if the language of the contract is reasonably susceptible to the proffered interpretation. *Id.* at 39-40. If so, then the parol evidence is admissible. *Id.* at 40.

The Court has provisionally considered the evidence proffered by both sides and concludes that SVGRP fails to raise a genuine issue of material fact as to whether there was a meeting of the minds on the terms of SVGRP's compensation, and further, that SVGRP is offering parol evidence for the prohibited purpose of supplying payment terms that are indisputably missing from the Master Agreement.

The record indicates that the Master Agreement initially was negotiated by Mr. Sowell and by Concert's then president, Jeff Pietsch, and Concert's then Chief Operations Officer, Keith Krueger. Dkt. No. 44-1 ¶ 4, Ex. C at 48:23-49:4. Although Mr. Schei, SVGRP's sole member and owner, signed the Master Agreement, he did not participate in the negotiations, but instead relied on Messrs. Pietsch and Krueger. *Id.* ¶ 8, Ex. G at 19:23-20:7. Later in the negotiations, Mr.

1   Pietsch was no longer directly involved in the discussions, and Mr. Krueger was solely responsible

2   for negotiating and finalizing the agreement.  *Id*. ¶ 7, Ex. F at 48:19-49:13.

3          Mr. Pietsch testified that negotiations began in early August 2016 and that, at the initial

4   meeting with Sowell Financial, Sowell Financial agreed that it would not make a profit and would

5   pay SVGRP 100% of the fees that were not distributed to the Advisors.  *Id*. at 85:23-86:24.  Mr.

6   Pietsch referenced a flip chart used during that meeting, and in discovery plaintiffs produced

7   pictures of a flip chart labeled "Jeff's notes" at the top.  *Id*. at 87:5-10; Dkt. No. 44-1 ¶ 13, Ex. K.

8   However, those pictures contain no information indicating that Sowell Financial agreed to pay the

9   entire portion of the remaining fees to SVGRP.  Rather, they include a deal point for discussion:

10  "Mutual Net Profit Share."  Dkt. No. 44-1 ¶ 13, Ex. K.

11         The parties then began to exchange drafts of the Master Agreement, and Mr. Krueger sent

12  an initial draft to Mr. Sowell on August 27, 2016.  Section 3 of that draft stated:

13             3.  <u>Compensation</u>.  In exchange for the Services provided hereunder,
               Sowell [Financial] shall pay to [SVGRP] a percentage of any fees,
14             commissions, or payments that it receives from [Advisor]s pursuant
               to any Sowell [Financial]/[Advisor] agreement in accordance with the
15             following Fee Sharing Schedules:

16             *This section is still a work in progress and probably much of this will
               be more finalized by the anniversary of the first 6 months.  The cost*
17             *savings and synergies are hard to identify today.  Felipe is working
               on a fixed per rep cost of back office services including Omni.*

18

19  Dkt. No. 44-2 ¶ 11, Ex. L.

20         Despite Mr. Pietsch's testimony as to the understanding purportedly reached in the parties'

21  initial meeting, internal emails at Sowell Financial indicate that Sowell Financial contemplated

22  that Sowell Financial would receive some sort of compensation and would not simply give 100%

23  of the remaining fees to SVGRP.  With respect to the first draft circulated by Mr. Krueger, David

24  Moenning, Sowell Financial's Chief Investment Officer, noted, "We need to know what the cost

25  of Omniscient is going to be for each advisor," to which Mr. Sowell remarked, "I've already had

26  this discussion with Keith and Felipe; they are working on a 'fixed' cost price."  Dkt. No. 44-2

27  ¶ 12, Ex. M.  And in response to Mr. Moenning's question, "When do we talk rev sharing on

28  current advisors?", Mr. Sowell commented, "Yes, this does need to be discussed."  *Id*.

13

Additionally, Chuck Hicks, Sowell Financial's Chief Operating Officer, noted:

> From my vantage point, the proposed CRM/Omniscient cost is high. Since that line item consumes 72% of the overall operating costs, it has a very large impact on the Operating Income number . . . which I believe should be split 50/50. For me, Section 3. <u>Compensation</u> (still under construction) is the most important part of the agreement. That number will dictate the "fixed" cost [Sowell Financial] is paid to absorb the liability of the [Concert] reps coming over. I'm satisfied with the "services provided" outlined in the agreement . . . how much we get paid is where the rubber meets the road.

*Id*. ¶ 13, Ex. N. In the version of the agreement Sowell Financial returned to Concert, the same "work in progress" language remained in the compensation provision. *Id*. ¶ 14, Ex. O.

In a subsequent draft of the agreement, plaintiffs added language to section 3, proposing that certain matters be determined nine months after the signing of the Master Agreement, including "Payment of a percentage of service group gross profit for compliance and regulatory oversight." *Id*. ¶ 15, Ex. P. In a draft returned by Sowell Financial, defendants revised the section 3 compensation language to state, in relevant part:

> 3. <u>Compensation</u>. In exchange for the Services provided hereunder, [Sowell Financial] shall pay to [SVGRP] a percentage of fees, commissions, or payments that it receives from [Advisors] pursuant to the [Sowell Financial]/[Advisor] agreements entered into th [sic] the [Advisors] formerly registered with [Concert] as set forth in each Statement of Work attached hereto as Exhibit A. . . .

*Id*. ¶ 16, Ex. Q. This draft included an appended "Statement of Work," which was a form to be filled in by each Advisor, indicating the specific services that the Advisor would receive and the fees that would be paid to SVGRP. *Id*. Mr. Krueger subsequently sent further revisions to Mr. Sowell; however, other than the correction of a small typographical error, the language of section 3 was the same as the previous draft and the proposed Exhibit A remained intact. *Id*. ¶ 17, Ex. R. Two days later, on Sunday, September 18, 2016, Mr. Krueger confirmed that "[o]ur side has agreed to the latest [Master Agreement]," noting that "[w]e will only need to fill in the Exhibit A Statement of [W]ork on Monday." *Id*. ¶ 18, Ex. S.

Shortly before the Master Agreement was signed, Mr. Krueger resigned from Concert and later began working for Sowell Financial. Dkt. No. 44-1 ¶ 9, Ex. H at 53:6-8; Dkt. No. 45-2 ¶ 8.

United States District Court
Northern District of California

And, for reasons that remain unexplained, the Master Agreement was executed on September 26, 2016 with no Exhibit A appended to it. Dkt. No. 44-2 ¶ 19, Ex. T. Mr. Krueger testified that, at that time, there still was no final agreement as to what SVGRP was to be paid. Dkt. No. 44-1 ¶ 9, Ex. H at 46:9-17, 48:11-17.

Indeed, the record indicates that negotiations over compensation continued even after the Master Agreement was signed. As discussed above, after SVGRP sent its invoice in November 2016, Mr. Sowell emailed Mr. Luna, stating that he intended to pay only half of the bill (i.e., keep half of the revenues), in view of the time, effort, and expense Sowell Financial put into the transition, as well as the additional risk the company undertook. Dkt. No. 44-2 ¶ 22, Ex. U. Mr. Luna objected, and his response indicates that there was still no final agreement regarding SVGRP's compensation and that some sort of fee splitting arrangement as between SVGRP and Sowell Financial was contemplated: "I think we need to get to a permanent financial fee sharing agreement in the next three business days. I am not aware of any agreement to reimburse for costs we did not agree to in advance nor that the splitting of revenue would be a unilateral decision." *Id*. Several days later, Mr. Luna informed Mr. Sowell that Mr. Pietsch was "tasked with completing the business conversations/negotiations before us," including "written confirmation of our previously agreed to 5% annual net profit share paid to [Sowell Financial] for the [SVGRP] advisors' platform fee from [SVGRP]."[6] Dkt. No. 44-2 ¶ 23, Ex. V. The next day, November 29, 2016, Mr. Sowell informed Mr. Schei that Sowell Financial was terminating the Master Agreement. *Id*., ¶ 24, Ex. W.

Against this backdrop, SVGRP focuses on the Exhibit A Statement of Work that was appended to the final draft of the Master Agreement. As noted above, the Statement of Work was a form to be filled in by each Advisor, indicating the specific services that the Advisor would receive and the fees that would be paid to SVGRP. The form states, in relevant part:

---

[6] At the motion hearing, defendants indicated that a platform fee represents the percentage of the overall revenue from the end client that the advisor would receive, whereas plaintiffs seemed to say that it represented the percentage of the fee retained by the RIA. Either way, that distinction does not impact the conclusions reached in resolving the present motion.

> **2. Services**:  During the term of this Statement of Work, [SVGRP] shall provide the following Services to [Sowell Financial] (the "Current Services"): _____.
>
> **3. Fees**:  In exchange for the Current Services provided to the [Advisor] identified in Paragraph 2 of this Statement of Work, [Sowell Financial] shall pay [SVGRP] the following Fees (the "Current Fees"): _____.

Dkt. No. 45-1 ¶ 3, Ex. B at ECF p. 59.  SVGRP asserts that it was understood that "Current Services" and "Current Fees" referred to the same arrangement for services and fees that each Advisor previously had in place with Concert.  In other words, SVGRP was to continue to receive all the fees that Concert previously retained with respect to each Advisor.

When probed at oral argument for its best evidence that that was, in fact, what the parties agreed to, SVGRP directed the Court to a series of internal Concert emails.  Despite SVGRP's insistence that the parties fully understood what the Statement of Work's "Current Fees" and "Current Services" meant, a September 18, 2016 email from Mr. Luna indicates that in reviewing the final draft of the agreement, not even he knew what would be put in the Statement of Work: "Just one question on the [S]tatement of [W]ork; what goes in there?"  Dkt. No. 45-1 ¶ 3, Ex. B at ECF p. 64.

Nevertheless, SVGRP focuses on another email Mr. Luna sent to Mr. Krueger shortly afterward:   "My concern is that the services agreement rules out any previous agreements in writing or verbal.  So, does that mean that it throws out our M[OU]?  It looks like this statement of work is supposed to cover the financials?"[7]  *Id*. at ECF p. 63.  In response, Mr. Krueger purported to summarize a conversation he had with Mr. Sowell:

> I spoke to Bill this morning.  The intent of the "[S]tatement of [W]ork" is an agreement between the [Advisor], [SVGRP] and [Sowell Financial].  Any financial terms are those of the financial advisor from their previous [Concert] billing terms. . . .
>
> To get this out of the [Master Agreement] document you actually have to refer to 4a which references the terms of the individual [Advisor] agreement. . . .

---

[7] Neither side submitted the referenced MOU to the Court and no one offered any argument about it.

16

Dkt. No. 45-1 ¶ 3, Ex. B at ECF p. 62.  SVGRP claims that Mr. Krueger's response was a

confirmation that Sowell Financial agreed to pay SVGRP 100% of the fees retained from the

Advisors.

SVGRP also notes that before and after the Master Agreement was signed, Mr. Sowell

announced to the public and internally that Sowell Financial entered into an agreement with

SVGRP.  *Id.* ¶ 2, Ex. A at ECF p. 29-38.  In particular, SVGRP highlights a communication from

Mr. Sowell to all Concert advisors, whether they had transferred or not, stating:

> I'd like to share some exciting news!  The "wheels are turning" and
> things are finally underway.  *Our agreement is in place*, advisors are
> getting registered and the first round of client paperwork is set to start
> being delivered as early as today. . . .
>
> So "what is the deal?"  Let me be very clear; this was not a merger,
> acquisition or buy-out.  The structure is one that will allow the operations
> and service team in San Jose to stay intact along with the ongoing
> development of Omniscient.  *Under the Service Agreement, we will
> utilize the San Jose office to facilitate the services they have been
> providing you.  This is a vendor relationship at market prices, this is not
> some sort of backdoor deal*. . . .

Dkt. No. 45-1 ¶ 2, Ex. A at ECF p. 31 (emphasis added).  SVGRP also points out that Sowell

Financial eventually paid the full amount of SVGRP's invoice for services rendered.

The problem for SVGRP is that it has presented no evidence in which either Sowell

Financial or Mr. Sowell acknowledges that the Statement of Work should be understood to mean

that SVGRP would continue to receive the full amount of the fees that Concert retained with

respect to each Advisor for back office/technical support *and* regulatory services, even though

SVGRP would provide only back office/technical support.  Defendants note that Mr. Krueger

testified that his email to Mr. Luna, in which he reported the conversation he purportedly had with

Mr. Sowell, concerned the billing terms between Sowell Financial and the Advisors, not the

billing terms between Sowell Financial and SVGRP.  Dkt. No. 44-1 ¶ 9, Ex. H at 48:2-10.  Indeed,

the "section 4a" referenced in his email is a provision that addresses agreements between Sowell

Financial and the Advisors.  Dkt. No. 45-1 ¶ 3, Ex. B at ECF p. 55.

More fundamentally, however, "Current Fees" and "Current Services" are terms that

appear only in the Statement of Work form and were never fully defined in that form. The fact remains that no Statement of Work was ever appended to the Master Agreement. Aside from section 3 of the Master Agreement, which simply refers to the non-existent Statements of Work, there is nothing else in the Master Agreement itself that defines what compensation SVGRP was to be paid. Despite Mr. Sowell's (begrudging) payment of SVGRP's invoice, and notwithstanding what he may have announced publicly or internally, there is ample evidence, unrefuted by SVGRP, that the parties continued to negotiate compensation terms even after the Master Agreement was signed. At best, SVGRP's extrinsic evidence indicates that there was confusion, even among plaintiffs' principals, as to what the final contents of the Statements of Work would be, and that the parties may have signed the Master Agreement with different understandings of what they were agreeing to. SVGRP's proffered extrinsic evidence therefore fails to raise a genuine issue of material fact that there was ever any mutual understanding regarding SVGRP's compensation. Additionally, the Court concludes that the Master Agreement is not reasonably susceptible to SVGRP's proffered interpretation, and SVGRP therefore may not use extrinsic evidence to supply missing compensation terms. Defendants' motion for summary judgment is granted as to the breach of contract claim.

**B.      Fraud**

Plaintiffs contend that defendants fraudulently induced them to enter the Master Agreement and transfer Advisors and related assets under management to Sowell Financial, when defendants actually had no intention of performing under the Master Agreement. Defendants move for summary judgment on the grounds that plaintiffs do not have sufficient evidence that defendants did not intend to perform obligations recited in the Master Agreement at the time the parties signed it, and that the relief plaintiffs seek is barred by the economic loss rule in any event.

"'Promissory fraud' is a subspecies of the action for fraud and deceit." *Lazar v. Super. Ct.*, 12 Cal.4th 631, 638 (1996). "A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." *Id*. "An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." *Id*. "In such

United States District Court
Northern District of California

cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract." *Id*. While a defendants' failure to perform "has some evidentiary value to show that a defendant made the promise without the intent to keep the obligation[,] . . . something more than nonperformance is required to prove the defendant's intent not to perform his promise." *Las Palmas Associates v. Las Palmas Ctr. Associates*, 235 Cal. App.3d 1220, 1239 (1991) (internal quotations and citation omitted).

"To be sure, fraudulent intent must often be established by circumstantial evidence." *Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 30 (1985). For example, "fraudulent intent has been inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform." *Id*.

Here, defendants contend, relying on deposition testimony and plaintiffs' interrogatory responses, that plaintiffs base their promissory fraud claim on nonperformance, i.e., Mr. Sowell's termination of the Master Agreement. Dkt. No. 44-1 ¶¶ 3-4, 8, Ex. B at 8:18-9:3; Ex. C at 140:9-18; Ex. G at 66:13-67:4. They say that plaintiffs' only evidence of "something more" than nonperformance of the Master Agreement is a blog post which indicates that Mr. Sowell said that the "arrangement" between SVGRP and Sowell Financial could "be canceled at any time." Dkt. No. 45-1 ¶ 2, Ex. A at ECF p. 29. Plaintiffs contend that this statement is false and demonstrates that defendants never intended to perform their obligations. The blog does not purport to quote Mr. Sowell, and defendants point out that in deposition, he was unable to confirm that he made that statement. Dkt. No. 46-1 ¶ 2, Ex. X at 78:23-79:14. But even assuming Mr. Sowell did say that the Master Agreement could "be canceled at any time," plaintiffs have not presented sufficient evidence giving rise to a triable issue that the statement is false. Indeed, section 4.b. of the Master Agreement provides that the agreement could be "terminated by either Party *at any time*," without cause. Dkt. No. 44-2 ¶ 19, Ex. T (emphasis added). The Court grants defendants' motion for summary judgment to the extent that plaintiffs' fraud claim depends on the alleged false statement that the Master Agreement could be canceled at any time.

Defendants' argument does not fully dispose of this claim, however, because plaintiffs'

evidence of defendants' intent not to perform under the Master Agreement is not based solely on termination of the agreement. Rather, plaintiffs also seem to rely on the timing and manner of Mr. Sowell's termination of the Master Agreement as evidence that defendants never intended to perform the obligations recited in the Master Agreement at the time it was made.[8] Here, plaintiffs point out that although the parties signed a Master Agreement that said the agreement could be terminated without cause on 90-days written notice, Mr. Sowell sent a termination letter shortly after the transition of Advisors and assets under management was completed, and stated that the termination was "[e]ffective immediately" without providing 90-days' notice. Dkt. No. 45-1 ¶ 2, Ex. A at ECF p. 14, 25, 39. Additionally, plaintiffs argue that despite Mr. Sowell's public and internal announcements confirming that Sowell Financial *had* entered into an agreement with SVGRP, Mr. Sowell's post-transition termination letter was the first time that defendants took the position that there actually was no agreement in place. *Id.* at ECF p. 29-39, 43. While the evidence presented by plaintiffs is thin, that evidence is sufficient to create a genuine issue of material fact regarding defendants' intent not to perform obligations recited in the Master Agreement at the time the parties signed it. *See Tenzer*, 39 Cal.3d at 30 (recognizing that fraudulent intent may be inferred from a defendant's "hasty repudiation of the promise"); *see also Davis v. NIH Fed. Credit Union*, No. 12-cv-05502-JCS, 2014 WL 722029, at *12-13 (N.D. Cal., Feb. 25, 2014) (concluding that the plaintiff submitted sufficient circumstantial evidence to defeat summary judgment based on, among other things, the timing and manner of plaintiff's employment termination).

Defendants nevertheless maintain that California's economic loss rule bars any damages plaintiffs seek. In discovery, each plaintiff identified its damages as $700,000.00 per year for at least five years. Dkt. No. 44-1 ¶¶ 2-3, Ex. A at 6:17-26; Ex. B at 10:6-16. Those sums, defendants argue, simply represent what plaintiffs contend they should have gotten under the

---

[8] The Court considers this a charitable reading of plaintiffs' opposition papers, which contain barely a page of argument on the fraud claim. However, the Court has reviewed the record placed before it by both parties and concludes that plaintiffs' evidence in support of the promissory fraud claim is based on more than nonperformance of the Master Agreement.

Master Agreement had it not been terminated.[9]

"Under the economic loss rule, 'purely economic losses are not recoverable in tort.'" *R Power Biofuels, LLC v. Chemex LLC*, No. 16-cv-00716-LHK, 2017 WL 1164296, at *4 (N.D. Cal., Mar. 29, 2017) (quoting *NuCal Foods, Inc. v. Quality Egg LLC*, 918 F. Supp. 2d 1023, 1028 (E.D. Cal. 2013)). The rule essentially bars tort claims based on contract breaches and limits contracting parties to contract damages. "Quite simply, the economic loss rule prevents the law of contract and the law of tort from dissolving one into the other." *JMP Securities LLP v. Altair Nanotechnologies, Inc.*, 880 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012) (internal quotations and citation omitted).

Defendants cite cases in which district courts within the Ninth Circuit have applied California's economic loss rule where the alleged promise that is the basis for the fraud claim is the underlying contract itself. *See, e.g., Foster Poultry Farms v. Alkar-Rapidpak-MP Equipment, Inc.*, 868 F. Supp. 2d 983, 993 (E.D. Cal. 2012) (citing *Oracle USA, Inc. v. XL Global Services, Inc.*, C 09-00537 MHP, 2009 WL 2084154 (N.D. Cal., July 13, 2009)). Nevertheless, as acknowledged in *Oracle*, fraudulent inducement is an exception to the economic loss rule. *Oracle*, 2009 WL 2084154, at *4 ("Exceptions have been permitted only where: a breach of duty causes a physical injury; the covenant of good faith and fair dealing is breached in an insurance contract; an employee was wrongfully discharged in violation of a fundamental public policy; or a contract was fraudulently induced."); *see also R Power Biofuels, LLC*, 2017 WL 1164296, at *5 ("[F]raudulent inducement is a well-recognized exception to the economic loss rule.") (internal quotations and citation omitted; alteration in original). Indeed, the California Supreme Court has recognized that if the promise that forms the basis of a promissory fraud claim "is enforceable [as a contract], the [plaintiff] . . . has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract." *Lazar*, 12 Cal.4th at 638

---

[9] SVGRP did also claim $700,000.00 for at least five years in contract damages. Dkt. No. 44-1 ¶ 2, Ex. A at 6:6-16. Concert's interrogatory response says that the $700,000.00 figure for its fraud damages "is based on [Sowell Financial]'s use of Omniscient []." *Id*. ¶ 3, Ex. B at 10:16.

United States District Court
Northern District of California

(internal quotations and citation omitted).[10]  In this diversity action, *Lazar* is binding upon this Court.  Accordingly, the Court concludes that the economic loss rule does not apply.

Defendants' motion for summary judgment as to plaintiffs' fraud claim is granted only insofar as the claim is based on the blog statement.  Defendants' motion is otherwise denied.

### C.      Slander/Libel

Plaintiffs claim that Mr. Sowell and Sowell Financial disparaged Concert, as well as the Lunas, with the aim of harming their reputations and persuading more Advisors to join Sowell Financial.  Defendants move for summary judgment, arguing that plaintiffs do not have sufficient evidence to support their claim for libel/slander.

In California, a defamation claim, which may be asserted as a claim for slander (oral) or libel (written), "involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." *Taus v. Loftus*, 40 Cal.4th 683, 720 (2007) (internal quotations and citation omitted); *see also KM Strategic Mgmt., LLC v. Am. Casualty Co. of Reading, PA*, 156 F. Supp. 3d 1154, 1166 (C.D. Cal. 2015) (same). Both slander and libel require "'a false and unprivileged publication.'" *KM Strategic Mgmt., LLC*, 156 F. Supp. 3d at 1167 (quoting Cal. Civ. Code §§ 45, 46).  "To be considered 'published,' the false statement must be made to at least one person other than the defamed." *Id*.  "The statement also must specifically refer to or concern the defamed plaintiff in some way." *Id*.  "The sine qua non of recovery for defamation . . . is the existence of falsehood." *ZL Techs., Inc. v. Does 1-7*, 13 Cal. App.5th 603, 624 (2017) (internal quotations and citation omitted).  A corporation can be defamed by statements that injure its business reputation. *Id*. at 623.

Whether a challenged statement is reasonably susceptible of a defamatory interpretation is a question of law. *Id*. at 624.  In making that assessment, a court uses a "totality of the circumstances" test, putting itself in the place of an average reader and determining the natural and probable effect of the statement. *Id*.  "Thus, a court considers both the language of the statement and the context in which it is made." *Id*. (internal quotations and citation omitted).

---

[10] At the motion hearing, plaintiffs confirmed that they are pursuing their fraud claim as an alternate theory to their claim for breach of contract.

Here, defendants point out that in response to interrogatories asking plaintiffs to identify the content, recipient, and date of each written or verbal statement they claim is defamatory, plaintiffs responded that Mr. Sowell "made defamatory statements concerning [Concert]'s SEC violations" and that Sowell Financial "made defamatory statements concerning [Concert] to advisors and clients." Dkt. No. 44-1, ¶ 3, Ex. B at 9:4-10:5. It is undisputed, however, that the SEC did find that Concert committed securities violations. Dkt. No. 44-1, ¶ 6, Ex. E at ECF p. 87-95. Moreover, plaintiffs' interrogatory responses fail to disclose the actual content of the alleged defamatory statements that were made.

Defendants further note that Elizabeth Luna, testifying as Concert's Rule 30(b)(6) designee, identified alleged defamatory statements in a letter written by Mr. Sowell, namely: (1) "The Lunas have been repeatedly reminded, but to this day are still involved. There could be a tremendous backlash for Fidelity, which we cannot allow," and (2) "When the new service group was created, we found out that Keith Krueger had resigned, Jeff Pietsch and Grey Syler were no longer managers of the service group, and Felipe and Liz are very active in managing and running the service group." Dkt. No. 44-1 ¶ 4, Ex. C at 146:3-6, 10-14.[11] The context of these statements appears to pertain to defendants' claimed key concern that neither Concert nor Mr. Luna could be involved in the ownership, management, or operation of the Fidelity accounts. While the statements appear to relate to the relationship between the parties, neither one specifically refers to Concert. *See KM Strategic Mgmt., LLC*, 156 F. Supp. 3d at 1167 ("The statement also must specifically refer to or concern the defamed plaintiff in some way."). Moreover, with respect to the truth or falsity of the identified statements, Ms. Luna seemed to acknowledge that the statements were true insofar as they concerned Concert, or at least she could not definitively say the statements were false:

> Q:     Now do you believe it's not true that Fidelity would not allow yourself or Mr. Luna or Concert be involved in the management of the [Advisor] accounts that were on its platform?

---

[11] Defendants failed to submit page 145 of the cited deposition transcript, which apparently contained the question that was posed to Ms. Luna. Nevertheless, plaintiffs have not disputed defendants' characterization of this portion of Ms. Luna's testimony.

> A:    So I think they were clear in saying that Concert [] could not have a relationship with Fidelity because they terminated our custodial arrangement.  But as far as the rest, I have no idea.  The only information that we received regarding that was from Mr. Sowell.
>
> . . . .
>
> Q:    So as you sit here today, do you know that it is untrue that Fidelity wouldn't have allowed the [Advisors] to remain on your platform if yourself or if Mr. Luna were in any way involved?
>
> A:    I don't know.

Dkt. No. 44-1 ¶ 4, Ex. C at 146:17-147:1, 150:14-18.  Additionally, defendants point out that Mr. Pietsch testified that based on his communications with Fidelity, his understanding was that Mr. Luna "would have to be remote from ownership and from operations" and that Fidelity would not allow Ms. Luna to remain as an advisor on the Fidelity accounts.  *Id.* ¶ 7, Ex. F at 68:1-16, 69:3-9, 71:16-72:4.

Ms. Luna also identified other emails written by Mr. Sowell that she felt indicated that she was lying, "spoke in very negative terms" about her competence and abilities, and "tarnished her reputation."  *Id.* ¶ 4, Ex. C at 151:15-21, 154:9-14, 155:1-15.  Ms. Luna, however, is not a party to this action.  Nor have plaintiffs argued or contended that these statements somehow implicated Ms. Luna acting in some capacity for Concert.

Indeed, plaintiffs did not respond at all to defendants' arguments about these alleged defamatory statements.  For the reasons discussed, the Court finds that these statements are not defamatory.

Instead, plaintiffs refer the Court to what appears to be the same letter written by Mr. Sowell that Ms. Luna identified in deposition.  According to plaintiffs, this letter was sent on November 28, 2016 (the day before Mr. Sowell terminated the Master Agreement) to all of the Advisors that transferred to Sowell Financial, as well as those that remained with Concert, including those that used TD Ameritrade as their custodian.  Plaintiffs contend that the letter contains statements falsely reporting that (1) contrary to Fidelity's wishes, the Lunas were running SVGRP and (2) Concert was somehow blocking Mr. Sowell's communications with Sowell Financial's advisors.  The purpose of this letter, plaintiffs argue, was to lure other advisors away

from Concert to join Sowell Financial.

Plaintiffs fail to specify the exact statements they contend are defamatory or to provide any arguments as to why each statement is false and has a natural tendency to cause injury or damage. Nevertheless, the Court has read and considered the entire November 28 letter. In context, it is a communication in which Mr. Sowell recounts his understanding of the arrangement between SVGRP and Sowell Financial and explains why he was terminating the Master Agreement. The statements or paragraphs that plaintiffs (apparently) allege are defamatory, which the Court has numbered for convenience, seem to be as follows:

> (1) The "Deal" as it was presented to us, was that the advisors would be referred to Sowell Management Services and we would take over the [Advisor] registrations and manage the RIA with the assistance of a service group, as a separate entity from Concert, that would be managed by Keith Krueger, Jeff Pietsch and Greg Syler AND that there would be no involvement, management, ownership or otherwise by Felipe and Liz Luna. This was dictated by Fidelity and agreed to by all in order to allow the Fidelity advisors the ability to stay at Fidelity, otherwise be forced off the platform. . . .

> (2) When the new service group was created, we found out that Keith Krueger had resigned, Jeff Pietsch and Greg Syler were no longer managers of the service group and Felipe and Liz were very active in managing and running the service group. This was in clear violation of what was agreed to, especially as it pertained to Fidelity. Fidelity was clear about there being no involvement by Felipe or Liz Luna in any form or capacity as it relates to the service group; no ownership, management or responsibility in any way. Without this agreement in place Fidelity would not have allowed the advisors or accounts to remain on their platform. The Luna[]s have been repeatedly reminded, but to this day, are still involved. There could be a tremendous backlash from Fidelity, which we cannot allow.

> (3) I'm certainly not going to use this communication to "air dirty laundry," however, I will say the straw that broke the camel's back was when we realized our emails to advisors were being monitored and blocked.

Dkt. No. 45-1 ¶ 2, Ex. A at ECF p. 41-42.

To support the alleged falsity of some of these statements, plaintiffs submit excerpts from the deposition of Matt Victorine, who is identified as Mr. Sowell's contact at Fidelity. Dkt. No. 45-1 ¶ 2, Ex. A at ECF p. 13; Dkt. No. 45-1 ¶ 4, Ex. C. In sum, Mr. Victorine testified that he did not tell Mr. Sowell that Mr. Luna could not have an ownership interest in SVGRP and did not

25

recall saying that Mr. Luna could have nothing to do with the service group. Additionally, Mr. Victorine testified that he did not dictate the relationship Mr. Sowell was forming with Concert and that he was not aware that Fidelity was doing so. Dkt. No. 45-1 ¶ 4, Ex. C.

Defendants object that at least some of the statements in the November 28 letter were never identified by plaintiffs in discovery as ones they consider defamatory, and they argue that plaintiffs should not be permitted to rely on those statements now for the first time on summary judgment. Plaintiffs acknowledge that they did not update their discovery responses after Mr. Victorine's deposition as required by Rule 26(e), which the Court finds troubling.

The Court need not belabor the point, however, because it finds that none of the statements that plaintiffs apparently refer to are defamatory anyway. Paragraph (1) is simply Mr. Sowell's recitation of his understanding of the arrangement between the parties. Mr. Sowell's statements about what Fidelity "dictated" regarding the Lunas' involvement are contradicted by Mr. Victorine's testimony. As discussed above, however, there is also competing testimony from Mr. Pietsch, who testified that his understanding was that Fidelity did not want the Lunas involved in its accounts. At best, plaintiffs have raised a fact issue about what, if anything, Fidelity required or communicated to the parties with regard to the Lunas' involvement in the arrangement between Sowell Financial and SVGRP.

Paragraph (2) appears to include some of the same statements Ms. Luna identified in deposition. For the reasons discussed above, those statements are not defamatory, and neither are Mr. Sowell's statements about what Fidelity did or did not require with respect to the Lunas' involvement in the arrangement between Sowell Financial and SVGRP.

Paragraph (3) does say that defendants' communications with advisors were being monitored and blocked, but the conduct is not attributed to anyone in particular. And plaintiffs have provided the Court with no basis to conclude that the statement specifically refers to Concert, as opposed to some other entity or person. *See KM Strategic Mgmt., LLC*, 156 F. Supp. 3d at 1167 ("The statement also must specifically refer to or concern the defamed plaintiff in some way.").

Defendants' motion for summary judgment is granted with respect to plaintiffs' claim for slander/libel.

### D.     UCL Claim, Cal. Bus. & Prof. Code § 17200

"The UCL prohibits any 'unlawful, unfair or fraudulent business act or practice,'" and "incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under state law." *Plascencia v. Lending 1st Mortgage*, 259 F.R.D. 437, 448 (N.D. Cal. 2009) (quoting Cal. Bus. & Prof. Code § 17200). Thus, "[v]iolation of almost any federal, state, or local law may serve as the basis for a UCL claim." *Id.* As discussed, some portion of plaintiffs' fraud claim survives summary judgment, and plaintiffs contend that they also have a viable derivative UCL claim. Defendants, however, argue that plaintiffs seek a remedy that is not available under the UCL.

"While the scope of conduct covered by the UCL is broad, its remedies are limited." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1144 (2003). Damages and non-restitutionary disgorgement are not available under the UCL. Instead, plaintiffs generally are limited to injunctive relief and restitution. *Id.* at 1144-45. In the UCL context, an order for restitution is "one compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Id.* at 1144-45 (internal quotations and citation omitted). By contrast, disgorgement is a broader remedy than restitution. *Id.* at 1145. An order for disgorgement "may compel a defendant to surrender all money obtained through an unfair business practice even though not all is to be restored to the persons from whom it was obtained or those claiming under those persons." *Id.* (internal quotations and citation omitted). Under the UCL, however, disgorgement of money obtained through an unfair business practice is an available remedy in a representative or individual action only to the extent that it constitutes restitution. *Id.*

In discovery, SVGRP identified defendants' unfair gains and SVGRP's losses resulting from defendants' alleged unfair business practices as follows: "$700,000.00 per year in lost basis for at least five years." Dkt. No. 44-1 ¶ 2, Ex. A at 7:9-8:2. SVGRP similarly claimed $700,000.00 in contract damages. *Id.* ¶ 2, Ex. A at 6:6-16. Concert stated that it "will suffer at least $700,000.00 per year in damages for at least five years based on [Sowell Financial]'s use of

[Concert]'s program—Omniscient []" and that it suffers "at least $700,000.00 per year in damages for its lost book of business, and $150,000 per year in lost basis for at least five years." *Id.* ¶ 3, Ex. B at 11:2-12:1.

Citing *Nat'l Rural Telecommunications Cooperative v. Directv, Inc.*, 319 F. Supp. 2d 1059 (C.D. Cal. 2003), defendants argue that plaintiffs' claimed UCL remedies actually are their claimed contract damages in disguise and therefore are not available under the UCL. However, only SVGRP has asserted a contract claim. Moreover, at least one court in this district has correctly observed that in *Nat'l Rural Telecommunications Cooperative*, the fact that a party requested the same amount in both restitution and damages was not dispositive. *See John Muir Heath v. Global Excel Mgmt.*, No. C-14-04226 DMR, 2015 WL 1359154, at *4 (N.D. Cal., Mar. 25, 2015). "Rather, the court . . . found that the remedy sought was not restitutionary, because it did not constitute the return of monies given, or funds in which the requesting party had an ownership interest." *Id.*

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134 (2003) sets out two alternate tests for what constitutes restitution. In that case, the plaintiff ("KSC") represented a Canadian company in its bid for a defense contract with the Korean government. If the contract was awarded to the Canadian company, KSC was to be paid a commission. After the contract was awarded to another company, allegedly as the result of bribes and sexual favors, KSC sued, asserting tort claims and under the UCL. The California Supreme Court held that KSC could not seek restitution under the UCL for its lost contingent commission because those were sums in which KSC had neither an ownership interest nor a vested interest:

> The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.

> The remedy sought by plaintiff in this case is not restitutionary because plaintiff does not have an ownership interest in the money it seeks to recover from defendants. First, it is clear that plaintiff is not seeking the return of money or property that was once in its possession. . . . Any award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff.

> Further the relief sought by plaintiff is not restitutionary under an alternate theory because plaintiff has no vested interest in the money

it seeks to recover. . . ..

29 Cal.4th at 1149.  Because KSC had, at most, an "attenuated expectancy" in its contingent lost commission, those sums could not be recovered as restitution under the UCL.  *Id.* at 1149-50.

Here, plaintiffs cite no authority to the Court.  Nor do they explain what they mean when they characterize some of the sums they seek as "lost basis."  And they apparently were unable to offer any explanation about that term in discovery.  In deposition, Ms. Luna said that she had not heard that term before and did not know what it means.  Dkt. No. 44-1 ¶ 5, Ex. D at 203:7-13.  Mr. Schei also did not know what "lost basis" means.  *Id.* ¶ 8, Ex. G at 73:13-14.

With respect to SVGRP, it has not established the $700,000.00 it seeks is restitutionary.  SVGRP gave no monies or property to defendants, and plaintiffs' opposition brief suggests that the claimed $700,000.00 simply represents the benefit SVGRP expected to receive had the Master Agreement (assuming a valid and enforceable contract was even formed) remained in force for the full five-year term:  "Plaintiffs do not need evidence from Defendants of the revenues they have received as a result of their wrongful conduct.  The evidence is the financial arrangements with the former Concert Wealth advisors remained the same."  Dkt. No. 45 at ECF p. 11.  In other words, SVGRP appears to base its recovery under the UCL on its theory that it was entitled to keep all of the profits (i.e., 100% of the fees not paid to the Advisors) generated by the Advisors' accounts for the term of the Master Agreement.  However, for the reasons discussed above, SVGRP failed to establish that that is what the parties agreed to do.  And, in any event, "[c]ompensation for a lost business opportunity is a measure of damages and not restitution to the alleged victim.  *Korea Supply Co.*, 29 Cal.4th at 1151 (internal quotations and citation omitted); *see also Nat'l Rural Telecommunications Cooperative*, 319 F. Supp. 2d at 1080 (concluding that the plaintiffs did not raise a genuine issue of material fact that they had a vested interest in sums which simply represented "expectation damages for what they believe they would have obtained if [defendant] performed in accordance with [third-party] [a]greements.").  Defendants' motion for summary judgment is granted as to SVGRP.

For much the same reason, Concert's claimed $700,000.00 in damages for five years based on Sowell Financial's use of Omniscient is also not an available remedy under the UCL.

Similarly, Concert's claimed "$700,000.00 per year in damages for its lost book of business" simply represents the sums Concert expected to make from those assets under management, which were not Concert's property and which Concert was *required* to transfer. Moreover, plaintiffs having provided absolutely no explanation for "lost basis" sums, defendants' motion for summary judgment is granted as to Concert's claimed $150,000 in "lost basis" damages.

Defendants' motion for summary judgment as to plaintiffs' UCL claim is granted.

## IV. CONCLUSION

Based on the foregoing, defendants' motion for summary judgment is:

1. GRANTED with respect to SVGRP's claim for breach of contract.
2. GRANTED IN PART AND DENIED IN PART with respect to plaintiffs' claim for fraud.
3. GRANTED with respect to plaintiffs' claim for slander/libel.
4. GRANTED with respect to plaintiffs' UCL claim.

The Court sets a further case management conference for March 19, 2019, 1:30 p.m. By March 12, 2019, the parties shall file a further Joint Case Management Statement. Along with the information normally required to be reported in that Statement, the parties shall include (1) their respective views regarding whether a settlement conference before a magistrate judge, or other ADR procedure, would facilitate resolution of this action, and if so, the proposed timing of any such conference or procedure; and (2) proposed dates for a Final Pretrial Conference and trial.

**IT IS SO ORDERED.**

Dated: February 15, 2019

VIRGINIA K. DEMARCHI
United States Magistrate Judge